UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ERIC JACK LOGAN, *Estate of, deceased*,

Plaintiff,

v.                                                        CAUSE NO. 3:19-CV-495 DRL-MGG

CITY OF SOUTH BEND *et al.*,

Defendants.

<u>OPINION & ORDER</u>

Our country has witnessed sobering cases of law enforcement using deadly force on unarmed citizens. At first blush, the headline here might read similarly—South Bend police sergeant kills Black man—but the circumstances of this summer night cannot be reduced to a mere headline. What is the same is the tragic loss of a human life. What is different is the deadly threat this suspect posed to the sergeant when he reasonably used his sidearm.

Confronted and separated by a few feet in the dead of night, Eric Jack Logan advanced toward Sergeant Ryan O'Neill with a Gerber knife raised over his head, ignoring quick commands to drop it. In a blink of an eye, the knife was thrown, and two bullets were shot. The knife struck the sergeant's arm, and one bullet struck Mr. Logan's abdomen. Sergeant O'Neill made a split-second decision to use deadly force—one that was difficult, but reasonable under the law.

The Estate of Eric Jack Logan brought this action against the City of South Bend and Sergeant O'Neill under 42 U.S.C. § 1983, alleging the sergeant violated Mr. Logan's constitutional rights under the Fourth and Fourteenth Amendments by using excessive force and discriminating against him on the basis of race. The court grants the defense's summary judgment motion. The United States Constitution prohibits unreasonable deadly force, not reasonable actions of law enforcement.

BACKGROUND

Eric Logan, a 53-year-old resident of South Bend, Indiana, was killed during an encounter with law enforcement at the Central High Apartments on June 16, 2019. That night, a 19-year veteran of the South Bend Police Department, Sergeant Ryan O'Neill,[1] responded to a 911 dispatch call about a suspect in dark clothing breaking into vehicles in the parking lot. From there, events unfolded quickly. The only living eyewitness is Sergeant O'Neill. There is no video or audio footage of the incident. The parties present forensic evidence.

When Sergeant O'Neill arrived at the parking lot, he observed a person leaning into the open driver's side door of a Honda [ECF 102-1 at 178]. Sergeant O'Neill parked his squad car and walked toward the Honda [*Id.* 181]. Standing about a foot from the Honda's back bumper, Sergeant O'Neill used his left hand to point his flashlight at the driver's door and rested his right hand on his holstered firearm [*Id.* 181, 185]. Sergeant O'Neill asked the person leaning into the Honda, later identified as Eric Jack Logan, if it was his car [*Id.* 193-94]. Mr. Logan backed out of the car slightly to look up at Sergeant O'Neill and said, "Yeah." [*Id.* 195]. Sergeant O'Neill observed a purse peeking out of Mr. Logan's sweatshirt pocket and asked why he had a woman's purse [*Id.* 195-96].

Mr. Logan stood up [*Id.* 196]. Sergeant O'Neill saw that Mr. Logan was carrying a napkin and a Gerber knife in his right hand, which he raised above his head [*Id.* 201]. Sergeant O'Neill was 5'8" and weighed 225 pounds [*Id.* 18]. Mr. Logan was 6'2" and weighed 269 pounds [ECF 102-4 at 2]. Mr. Logan wielded a Gerber knife approximately 8 inches long, including a 3.5-inch blade—a hunting-style knife with a blunted tip and control jimping ridges:

---

[1] Though the court recognizes that Ryan O'Neill is no longer employed by the South Bend Police Department, the court refers to him as Sergeant O'Neill as that was his title at the time of these events.



What happened next occurred in a matter of seconds [ECF 102-1 at 207]. Mr. Logan advanced on the sergeant with the knife raised [*Id.* 204]. Sergeant O'Neill backpedaled, drew his gun, and ordered Mr. Logan repeatedly to put the weapon down: "Drop the knife. Drop the knife. Drop the knife" [*Id.* 203, 205]. Mr. Logan forged forward, knife still raised, clearing the length of the Honda [*Id.* 211; ECF 102-6 ¶¶ 9-10]. Mr. Logan didn't say anything. He started making guttural sounds [ECF 102-1 at 198].

Mr. Logan came within about seven and a half feet—a mere three steps away—when Sergeant O'Neill fired two shots from his hip [*Id.* 207, 211] and Mr. Logan threw his knife at Sergeant O'Neill. Sergeant O'Neill testified that the thrown knife and gunshots occurred "almost one on top of the other" [*Id.* 211]. The knife hit Sergeant O'Neill's forearm [*Id.* 210, 212]. Sergeant O'Neill's first shot struck the car door. The second shot hit Mr. Logan's abdomen.

Sergeant O'Neill ordered Mr. Logan to get on the ground and put his hands behind his back, and only then Mr. Logan complied [*Id.* 218]. Sergeant O'Neill alerted dispatch that shots were fired and that he needed an ambulance [*Id.* 214]. Mr. Logan was taken to the hospital for emergency surgery, but he did not survive [*Id.* 222].

The autopsy found that the cause of death was a gunshot wound to the abdomen [ECF 102-4 at 1]. The single bullet entered Mr. Logan's right upper abdomen 11 inches below the top of the right shoulder and 4.5 inches right of the midline with a "front to back, downward, slightly right to left" direction [*Id.* 4].

The Gerber knife, which was later identified as being stolen from a car in the Central High Apartments parking lot, was recovered at the scene [ECF 102-5 ¶ 4]. An examination of the knife did not reveal any latent fingerprints [ECF 134-13 at 80-81; ECF 134-14; ECF 134-15].

At the time of this shooting, the South Bend Police Department had a use of force policy that permitted an officer to "use deadly force to protect [himself] or others from what [he] reasonably believes would be an imminent threat of death or serious bodily injury" [ECF 102-8 at 3]. The department prohibited "bias-based policing," including an "inappropriate reliance on characteristics such as race, ethnicity, national origin, religion, sex, sexual orientation, gender identity or expression, economic status, age, cultural group, disability or affiliation with any non-criminal group . . . as the basis for providing differing law enforcement service or enforcement" [ECF 102-9 at 1]. Sergeant O'Neill participated in annual continuing education training [ECF 102-1 at 81].[2]

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll. v. Valparaiso Comty. Schs.*, 953 F.3d 923, 924 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th

---

[2] The Estate attached five sealed exhibits to its response brief regarding Sergeant O'Neill's history but never relied on them [*see* ECF 136-140]. The exhibits have no bearing on the court's ruling, so the court grants the motion to seal. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010).

Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

A.      *The Law Requires Summary Judgment on the Excessive Force Claim.*

Excessive force claims, including those involving deadly force, arise under the Fourth Amendment to the United States Constitution. *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The Fourth Amendment prohibits "unreasonable searches and seizures" by the government to safeguard "[t]he right of the people to be secure in their persons." U.S. Const. amend. IV. The use of deadly force is a "seizure" subject to the Fourth Amendment's reasonableness requirement. *Garner*, 471 U.S. at 7; *Siler v. City of Kenosha*, 957 F.3d 751, 758 (7th Cir. 2020).

The Fourth Amendment examines an officer's actions objectively—whether the officer acted in an objectively reasonable manner. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also Taylor v. City of Milford*, __ F.4th __, 2021 U.S. App. LEXIS 24829, 10 (7th Cir. Aug. 19, 2021). The court considers "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Deadly force may be used when an officer has probable cause to believe that an armed suspect "poses a threat of serious physical harm, either to the officer or to others," or "committed a crime involving the infliction or threatened infliction of serious physical harm . . . if necessary to prevent escape." *Garner*, 471 U.S. at 11; *accord Siler*, 957 F.3d at 759; *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018).

In seeking to understand what a reasonable officer would have done, the law assesses the totality of the circumstances confronting the officer, including what he knew at the time. *See Cnty. of*

*Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546-47 (2017); *Burton v. City of Zion*, 901 F.3d 772, 780 (7th Cir. 2018). The law places a reasonable officer in the exact scenario that the officer actually faced. The court must consider "the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Siler*, 957 F.3d at 759 (internal quotations and citation omitted); *see also Graham*, 490 U.S. at 396-97.

"Law enforcement officers on the scene do not have the luxury of knowing the facts as they are known to [courts later], with all the benefit of hindsight, discovery, and careful analysis. Officers must act reasonably based on the information they have." *Siler*, 957 F.3d at 759; *accord Graham*, 490 U.S. at 396 (officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). "[E]ncounters in the field require officers to make split-second decisions of enormous consequence," *Siler*, 957 F.3d at 759, often "in circumstances that are tense, uncertain, and rapidly evolving," *Graham*, 490 U.S. at 397. The law does not divorce the objective constitutional standard from this reality.

The case today asks whether a reasonable officer under the circumstances would have believed that Mr. Logan posed an imminent threat of serious physical harm to the officer. *See Garner*, 471 U.S. at 11; *Siler*, 957 F.3d at 759. If he threatened the officer with a weapon, deadly force may be used because the risk of serious physical harm to the officer exists. *See Sanzone*, 884 F.3d at 740. The availability of less severe alternatives, such as a TASER device, pepper spray, or other tools of force, "does not necessarily render the use of deadly force unconstitutional." *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018). The Fourth Amendment doesn't require "the use of the least or a less deadly alternative so long as the use of deadly force is reasonable." *Id.* (citation omitted).

"The obligation to consider the totality of the circumstances in these cases often makes resort to summary judgment inappropriate." *Siler*, 957 F.3d at 759. Of course, when material facts remain disputed, a jury must resolve these disputes and determine whether the officer acted reasonably. *See*

*Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). That proves true in deadly force cases when the evidence surrounding the officer's use of force remains susceptible to different sensible interpretations, not least because the suspect has died and "the witness most likely to contradict the officer's testimony—the victim—cannot testify." *Id.* When the suspect has died, the law requires a "fairly critical assessment" of the evidentiary record, including forensic evidence, the officer's original report and statements, and expert opinions to decide whether his testimony could reasonably be rejected at trial. *Est. of Green v. City of Indianapolis*, 854 F. Appx. 740, 746 (7th Cir. 2021) (citing cases); *Est. of Escobedo v. Martin*, 702 F.3d 388, 409 (7th Cir. 2012).

The facts here bear many similarities to a case the court of appeals decided last year. *See King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981 (7th Cir. 2020). That case began after two deputies went to a man's home to perform a "welfare check." *Id.* at 983. The man exited the house, walked toward the deputies, and pulled a ten-inch knife out of his shorts pocket. *Id.* The deputies backpedaled, drew their firearms, and yelled at him to drop the knife. *Id.* The man raised the knife in his left hand and started moving toward one deputy. *Id.* Once he was about eight feet away from the deputy, the deputy fired one gunshot, which ultimately killed the man. *Id.* This circuit held that the deputy's use of deadly force was constitutionally reasonable, thereby affirming the district court's summary judgment. *Id.* at 987.

The court employs the same critical assessment of the evidence today. Taking all reasonable inferences in the Estate's favor, if Mr. Logan advanced toward Sergeant O'Neill with a knife raised,

ignored the officer's orders to drop it, and then posed an imminent threat of serious physical harm to the officer mere steps away, then Sergeant O'Neill's use of deadly force was constitutionally reasonable. *See id.* On the other hand, if the Estate has offered evidence that could convince a rational jury that Sergeant O'Neill acted unreasonably, then the court must deny summary judgment. Evidence that only raises a "metaphysical doubt" is not enough, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), nor are factual disputes that are "irrelevant or unnecessary," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

1.      *The Absence of Body Camera Video.*

The Estate posits excessive force by first pointing to the lack of body camera video footage. Sergeant O'Neill never activated it before the encounter. It might be easier to decide this case if body camera footage existed, but its absence doesn't tend to prove that Sergeant O'Neill used excessive force against Mr. Logan. It is immaterial. The court proceeds on what evidence exists, not on what doesn't exist.[3]

2.      *Sergeant O'Neill's Statements about the Timing of Events.*

Over the course of the night and investigation into this incident, Sergeant O'Neill made several statements about what transpired. The Estate argues that his statements conflict in a way that would permit a reasonable jury to discredit them.

First, Sergeant O'Neill called dispatch and said, "Shots fired. Give me an ambo." [ECF 103, Ex. H, Pt. 1 at 0:03-0:07]. He then told dispatch, "Yeah, I'm fine. Another unit here. Guy threw a knife at me." [*Id.* Pt. 2 at 0:06-0:12].

Moments later, as recorded on his body-worn camera, the sergeant repeated, "Yeah, f---er threw that knife at me. He's coming at me with the knife and I'm like drop the knife, drop the . . . and he f---king throws it at me. Yeah he f---ing threw the knife at me, so I f---ing shot him." [ECF 103,

---

[3] The Estate listed this fact in its "statement of additional facts" [ECF 134-2, ¶¶ 1-2, 4], but not in its "statement of genuine disputes." The Estate seems to recognize that the lack of body camera footage is immaterial.

Ex. I at 3:34:40-3:34:55]. At the time Sergeant O'Neill made these statements, his body camera shows at least four other officers walking around the scene, and it doesn't appear that he was directing these statements toward any one person in particular [*Id.*].

A few minutes later, Sergeant O'Neill described the full encounter to another officer at the scene:

> So I saw him bent in this uh, he had a cut hand so obviously he broke glass, and he had a woman's purse shoved in there. So I come up and I'm like hey man, is this your car and he goes yeah. I said uh why you got a woman's purse and he lifts his hands up I can see he has a knife in hand and he's going (grunt sounds) coming at me and then he f---ing lifts it up like this and so I'm like, I'm telling him drop that knife, don't, drop that knife, he kind of said bam bam, shot him twice.

[*Id.* Ex. I at 3:35:50-3:36:20].

Less than two minutes later, Sergeant O'Neill told Sergeant Hiipaaka what happened:

> Pulled up and he's bent in this car, I can see that he's got a woman's purse shoved into his uh pocket. So I said hey man is that your car and he goes yeah, but I saw the woman's purse shoved in it, so he backs up and I can see he has this knife in his hand, and I'm like dude drop that knife drop that knife. He's coming at me with a knife and I'm backing up and he goes to throw it so I f---ing shot him twice.

[*Id.* Ex. I at 3:37:30-3:37:54].

A few hours later, Sergeant O'Neill described the incident to the Metro Homicide Unit during its interview:

> As he turns to face me, I keep following that hand and I see there is a knife there, and it took me a second because he he's got that napkin in his hand. And so, now my mind is going quick, because we are only probably about 7, 8 feet away from each other. So, I see that knife and pull my pistol out right away and I start backing up and the thought went through my head as his arm came up, holding the knife, the thought came to me to back pedal because if I can create some distance.

> Because he is standing 10 feet away from me with a knife, and I'm standing, I feel pretty good about that, in the sense of, maybe, I can negotiate with him, get him to drop it, see what his intentions are.

> But as soon as he came up with that, he made these uh, just a couple of these guttural sounds, kind like "ugh ugh" and uh so I took those 3, 4 steps, but he started walking toward me.

So, you know I have had my gun out thousands of times working midnights for over 19 years, but this was the first time it got to that critical distance where with as tall as the guy is, he's probably, 6'2, 6'3, he's a big guy, and I. Honestly, I was watching that knife up in the air, and with the way he was walking toward me, I could feel that, I mean he was going to get me, he could get me for sure.

And, all I could imagine is that knife coming down on my head, so I fired two quick shots, and that motion that he had started, went forward with force, and I had the flashlight like this and that's when the knife hit me in the arm.

[ECF 155, Ex. J at 7:35-9:13].

The Estate argues that a jury needn't accept Sergeant O'Neill's version of these events, citing *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116-17 (9th Cir. 2016). That case, aside from being the law of a different circuit, is quite different. There law enforcement officers recounted different versions of the events, and each of their versions conflicted with the autopsy report and video evidence. *Id.* at 1116. Those aren't the circumstances here. Sergeant O'Neill's statements remain reasonably consistent, without conflicting with the forensic evidence.

The Estate says a reasonable jury could infer that Sergeant O'Neill shot Mr. Logan after Mr. Logan had thrown the knife. The Estate argues that Sergeant O'Neill's second statement is inconsistent with the other statements because, at that point, he said, "He f---ing threw the knife at me, so I f---ing shot him." The Estate uses this statement to advocate that Sergeant O'Neill shot an unarmed man because he fired his weapon after Mr. Logan threw the knife.[4] The Estate argues that a jury may credit the second statement as a more accurate representation of what occurred.

The court won't weigh the evidence at summary judgment or assess the credibility of any witness, including Sergeant O'Neill. *See Waldridge*, 24 F.3d at 920 (the court is "not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe"); *Walker v. Sheahan*, 526 F.3d 973, 980 (7th Cir. 2008) ("credibility determinations are inappropriate on summary

---

[4] The Estate also tries to introduce a nurse's note from the hospital where Mr. Logan received treatment. Aside from being inadmissible hearsay, and double hearsay at that, the nurse's note provides no information material to the contemporaneity of the knife throw and the gunshots. *See* Fed. R. Civ. P. 56(c) (requiring admissible evidence); Fed. R. Evid. 802.

judgment"). As the Estate points out, at summary judgment, the court must "accept the facts most favorable to the non-moving party" even if "paradoxically, those [facts are] pronounced by the defendants." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 762 (7th Cir. 2006).

The Estate inappropriately invites the court to take a split-second event, replay it in slow motion, and parse out the precise moments when the knife and bullets left these men during their confrontation, whether the knife left slightly before a gunshot or whether they literally passed each other in the dark. *See Horton*, 883 F.3d at 950 ("we must refuse to view the events through hindsight's distorting lens"). Sergeant O'Neill's statements aren't inconsistent in any meaningful way. A formalistic lawyer might like to read more into the second statement, but no reasonable jury could objectively view this incident as anything but split-second and contemporaneous. No statement implies any measurable or meaningful separation of time between the knife throw and the gunshots, much less a material change in the circumstances that the sergeant faced. *See id.* Sergeant O'Neill acted reasonably whether he fired his sidearm at the same time or in the instant after Mr. Logan threw the knife at the law enforcement officer.

The law directs this same conclusion. *See id.* at 953 (affirming summary judgment when officer objectively had reason to think the assailant was armed and dangerous, and posed an imminent threat of death or serious bodily harm). Law enforcement officers may "err on the side of caution when faced with an uncertain or threatening situation." *Id.* at 951 (quoting *Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009)). The law considers "the totality of the circumstances, including the pressures of time and duress, and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Id.* at 950.

This isn't a situation in which a reasonable jury could conclude that an officer chased a vehicle in hot pursuit, engaged as it stopped, but then fired twice only after the vehicle had driven three or four houses down the block—namely, that the threat had diminished. *See Lytle v. Bexar Cnty.*, 560 F.3d 404, 414 (5th Cir. 2009). The tragedy occurred in the snap of a finger, and the sergeant's response to

this deadly force was objectively reasonable. *See King*, 954 F.3d at 987; *see also Hathaway v. Bazany*, 507 F.3d 312, 322 (5th Cir. 2007) (officer justified in using deadly force even if the suspect's car struck him first because the two exchanges of force happened "in near contemporaneity"). No reasonable jury could say otherwise.

        3.     *Sergeant O'Neill's Testimony about the Knife Blade.*

The Estate claims Sergeant O'Neill later said Mr. Logan was holding the knife in front of him rather than above his head when he fired his sidearm. This argument mischaracterizes Sergeant O'Neill's deposition testimony. He consistently testified that Mr. Logan held the knife above his head [ECF 102-1 at 201, 204]. The question of his testimony was the precise direction of the blade— whether facing down or another direction [ECF 134-4 at 243]—but that has no bearing on whether Sergeant O'Neill acted reasonably in the face of an advancing suspect, knife held high.

        4.     *Sergeant O'Neill's Past Conviction for Ghost Employment.*

The Estate next argues that a reasonable jury could discredit Sergeant O'Neill's version of events because he has an unrelated conviction for ghost employment, a level six felony in Indiana. Ghost employment occurs when a government employee receives payment for performing tasks outside his official duties. The Estate offers the transcripts from Sergeant O'Neill's plea hearing and sentencing (more than a year after this shooting) [ECF 134-10, 134-11] based on conduct that occurred exactly one month before the shooting. This conviction isn't related to the shooting.

Instead, the Estate argues that it should be allowed to use this conviction to attack Sergeant O'Neill's character for truthfulness, *see* Fed. R. Evid. 609, but a future credibility challenge of this type proves insufficient to avoid summary judgment under the law, *see Outlaw v. Newkirk*, 259 F.3d 833, 841 (7th Cir. 2001) ("mere prospect of challenging a witness's credibility . . . is not enough, standing alone, to avoid summary judgment"); *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997) ("[plaintiff] cannot avoid summary judgment with an unadorned claim that a jury might

not believe [the defendant's] explanation"); *see also* Fed. R. Civ. P. 56(e) advis. comm. n. (1963); *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998).

In its argument, the Estate cites one case, *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010), for the proposition that summary judgment can be inappropriate in excessive force cases when evidence surrounding the officer's use of force often is susceptible to different interpretations. There the lieutenant said he deployed his TASER five or six times, but the TASER's internal computer registered twelve trigger pulls during the relevant time period. *See id.* The lieutenant described the suspect's "barrel-roll down the driveway" as an attempt to flee, but a reasonable jury could conclude that it was merely an involuntary reaction to one of the TASER applications. *See id.* at 862-63.

But no such legitimate evidence today draws into question the testimony about this night or establishes contradictions under oath on material matters. *See Allen v. Chi. Transit Authority*, 317 F.3d 696, 699-700 (7th Cir. 2003). The Estate must "present affirmative evidence" to defeat a properly supported summary judgment motion. *Anderson*, 477 U.S. at 256-57. The Estate never articulates what sort of "different interpretation" a jury could reasonably reach merely because in an unrelated matter Sergeant O'Neill was convicted of ghost employment, except its position that the law disallows. *See Outlaw*, 259 F.3d at 841. Because the record as a whole points in one direction, no triable issue remains for the jury. *See Matsushita*, 475 U.S. at 587.

5.      *The Lack of Fingerprints on the Knife.*

Suspects often wield knives, firearms, and a host of other things even though forensics cannot find fingerprints or DNA. This isn't uncommon. The lack of fingerprint evidence is "not affirmative evidence that contradicts [an officer's] testimony." *King*, 954 F.3d at 986; *accord United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005). Unlike what people may see in criminal dramas on television, in reality few identifiable latent fingerprints are typically found. *See King*, 954 F.3d at 986. The Estate's argument does nothing more than invite speculation whether Mr. Logan was holding the knife, but the law won't permit juries to speculate. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

6.    *The Downward Trajectory of the Bullet Wound.*

The Estate presents testimony from Dr. Darin Wolfe about the trajectory of the bullet that killed Mr. Logan. Dr. Wolfe is a forensic pathologist. During the autopsy, he found that the bullet entered Mr. Logan's front right abdomen at a downward trajectory [ECF 134-16 at 51].

The Estate argues that, because the bullet entered Mr. Logan's abdomen at a downward angle, a jury could find that Mr. Logan was on the ground when he was shot, thus posed no immediate threat of serious harm to Sergeant O'Neill. The Estate says the bullet entered the front right abdomen at a downward trajectory; for the bullet to have that trajectory, Mr. Logan's body either had been in a forward motion or the gun had been above the wound when it was fired.

Dr. Wolfe testified that the bullet had a downward trajectory [*Id.* 51-52]. He often avoids using a trajectory rod because they can be misleading, but he believed that its use made sense here because it was a simple gunshot wound [*Id.* 53]. Based on the downward trajectory, Dr. Wolfe said it was "a possibility" that Mr. Logan reacted to the first bullet by ducking and then the second bullet hit him while he was moving forward [*Id.* 87]. In his words, "in general, for a bullet to have a downward trajectory, either Mr. Logan's body had to be somewhat in a forward position or the gun had to be in an above position" [*Id.* 88]. Dr. Wolfe concluded that "it was a reasonable thought for somebody to say [] he [had] leaned forward when that bullet hit him" [*Id.* 88].

Quite consistently, Sergeant O'Neill said Mr. Logan was moving forward right before he shot him, recalling: "He's coming at me with the knife;" "he's going (grunt sounds) coming at me;" "He's coming at me with a knife and I'm backing up;" "with the way he was walking toward me, I could feel, I mean he was going to get me." That the bullet had a downward trajectory doesn't discredit Sergeant O'Neill's recitation of the events. The law doesn't permit the jury to guess that this downward angle really means that Mr. Logan was on the ground when no evidence supports that view. *See McCoy*, 341 F.3d at 604 (court isn't "required to draw every conceivable inference from the record" and "mere

speculation or conjecture will not defeat a summary judgment motion") (citations and internal quotation marks omitted).

> 7. *William Harmening's Review of the Case.*

William Harmening is a forensic psychologist. The Estate offers his opinions to argue that Mr. Logan posed no immediate threat to Sergeant O'Neill such that his use of force was excessive. Mr. Harmening credits Sergeant O'Neill's explanation of the events immediately after the shooting as the most reliable; and opines that Sergeant O'Neill had his feet planted slightly more than five feet from the Honda door and shot Mr. Logan while he was on his knees, located at or against the Honda's open door [ECF 134-5 at 10-11].

Mr. Harmening's credibility opinion is inappropriate. It isn't the role of an opinion witness to sift through the testimony of another witness and decide the implication of any seeming inconsistencies. *See Stachniak v. Hayes*, 989 F.2d 914, 925 (7th Cir. 1993) (quoting *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)) ("credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury"); *see also Est. of Loury by Hudson v. City of Chi.*, 2019 U.S. Dist. LEXIS 38029, 14 (N.D. Ill. Mar. 11, 2019). That is no less true when the record lacks any material or meaningful inconsistency in the statements from Sergeant O'Neill.

For his only true opinion, Mr. Harmening primarily relies on blood stain evidence. He says "the evidence, particularly the blood stains, shows that [Mr.] Logan stood to his feet and began walking toward the squad car" [ECF 134-5 at 23]. He tries to discredit Sergeant O'Neill's version as inconsistent with the blood stains. He suggests Mr. Logan was on his knees when he was shot, but he dismisses the downward trajectory of the bullet as immaterial to understanding the night's events:

> It may [be] true that the trajectory is consistent with Logan being bent forward. It is also consistent with Logan being upright on his knees with O'Neill shooting downward; or Logan being flat on his back with O'Neill firing downward and at an angle from Logan's 12 o'clock position. The truth is, there are an endless number of

possibilities that would be consistent with a 30-degree downward trajectory. That by itself tells us little. [*Id.* 20].

Expert opinions must be reliable and helpful. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Constructora Mi Casita v. NIBCO, Inc.*, 448 F. Supp.3d 965, 970-71 (N.D. Ind. 2020). The court must decide an opinion's reliability and fitness before the jury ever hears it. *Daubert*, 509 U.S. at 594-95. This duty extends to all proposed expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Mr. Harmening's blood stain opinion is unreliable and unhelpful.

First, Mr. Harmening lacks the qualifications to perform a reliable blood stain analysis. This isn't an abstract question. Qualifications must provide a foundation for a proposed expert to answer a specific question. *See, e.g., Gayton v. McCoy*, 593 F.3d 610, 617-18 (7th Cir. 2010) (allowing physician to opine about effects of vomiting on body but not pharmacological effects of drugs on heart). Mr. Harmening, no matter his other qualifications, lacks the credentials to conduct a blood stain analysis.

Mr. Harmening served as a law enforcement officer for just over six years (1981-1985 and 1990-1993) [ECF 107-2 at 6; ECF 107-3 at 5]. He worked for the sheriff's department in Menard County, Illinois, one of the smallest counties in the state [ECF 107-2 at 6]. While an officer, only one shooting homicide occurred in the county, and neither he nor his department investigated it [*Id.* 7]. The remainder of his career was spent investigating securities fraud and child exploitation, not shootings or blood stain analysis [*Id.* 7-8; ECF 107-3 at 4-5]. The only training he received on blood stains occurred during a one-week course in late 1990 or early 1991 during the academy, and that training covered "a little bit about blood splatter" among a host of other unrelated subjects [ECF 107-2 at 110-11].

A "little bit" of training scattered in a one-week session 30 years ago doesn't credential an expert on blood stain analysis. An opinion must originate from expertise or other specialized knowledge—be it from prior education, experience, or training. *See* Fed. R. Evid. 702. It can't be "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. His "little bit" of training

hasn't grown. He has taught forensic psychology and related courses since 2006, but nothing from his teaching experience establishes credentials in blood stain analysis [ECF 107-3 at 2-4]. His publications and presentations focus on the psychological aspects of forensics, not blood stain analysis [*Id.* 1-2]. His degrees are in psychology too [*Id.* 2]. Whatever his credentials in forensic psychology, he lacks any measurable credentials in blood stain analysis. *See Gayton*, 593 F.3d at 617.

This court isn't the first to reach this conclusion. *See Cole v. Perry*, 2019 U.S. Dist. LEXIS 156196, 30-31 (S.D. Ind. Apr. 30, 2019) (excluding Mr. Harmening's testimony because his qualifications in behavioral science were insufficient to establish an expertise in ballistics, handguns, crime scene reconstruction, crime scene analysis, or crime scene diagrams); *Est. of Miguel Gonzalez et al. v. Bd. of Cnty. Comm'rs of the Cnty. of Bernalillo et al.*, Case No. 1:18-CV-125 KG-LF (D.N.M. July 29, 2019) [ECF 107-7] (excluding Mr. Harmening's testimony because he lacked training or experience in blood evidence, shooting reconstruction, wound characteristics, and bullet trajectories); *Easterwood v. Village of Dolton et al.*, Case No. 1:17-CV-2888 (N.D. Ill. May 8, 2019) [ECF 107-8, 107-9] (barring forensic interpretation opinions from Mr. Harmening).

Worse still, Mr. Harmening's blood stain theory lacks a reliable factual basis and methodology. *See Daubert*, 509 U.S. at 590; *Constructora Mi Casita*, 448 F. Supp.3d at 970-71. Mr. Harmening examined photographs that metro homicide took the morning of the shooting [ECF 107-2 at 118]. He performed no testing or analysis. When asked about certain spots in the photographs, Mr. Harmening admitted he could not even say whether the spots were actually blood; nor could he say whether they came from Mr. Logan's hand or his gunshot wound or whether a spot even came from Mr. Logan at all [*Id.* 131-32, 135]. Asked if the spots could represent blood from Mr. Logan's pathway to the car before being shot, Mr. Harmening candidly confessed, "I don't know that I'm qualified to even make that determination" [*Id.* 135].

In truth then, his opinion is no opinion at all, much less one supported by any credentials in blood stain analysis, testing, verifiable facts, or any reliable methodology. The law deems his testimony

unreliable and inadmissible. The court excludes it. *See Daubert*, 509 U.S. at 590. It creates no triable issue of fact for the jury to decide.

        8.     *Dennis Waller's Proposed Opinions.*

The Estate tenders Dennis Waller's testimony. Mr. Waller has expertise in police practices. He opines that Sergeant O'Neill's use of force was inconsistent with nationally accepted police practices *if* Mr. Logan had already thrown the knife and Mr. Logan no longer posed a threat when the sergeant fired his gun [ECF 134-6 at 8].[5] Alternatively, he says Sergeant O'Neill should have fired more shots *if* Mr. Logan still had the knife, until the threat was over [*Id.* 10-11]. So he proposes to offer the jury alternative opinions—either Sergeant O'Neill shouldn't have fired his gun or didn't fire it enough.

His opinions remain entirely unhelpful. *See Daubert*, 509 U.S. at 591; *see, e.g., Constructora Mi Casita*, 448 F. Supp.3d at 974. They don't reliably guide a factfinder to answer the operative question: whether Sergeant O'Neill acted reasonably, and objectively so under the Constitution, when engaged by a larger man advancing on him with a Gerber knife who refused commands to drop the knife and when the two men exchanged force in near contemporaneity. Instead, Mr. Waller would confuse a jury by introducing two hypothetical scenarios that aren't reasonably supported by the facts here. *See also* Fed. R. Evid. 403, 702; *see, e.g., Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) (excluding testimony when witness relied on an assumption not based on evidence).

In short, his opinions lack not only a sound factual basis but the right fit for today's case. *See Daubert*, 509 U.S. at 591. Although police practices experts may play a useful role at times, *see, e.g., Calusinski v. Kruger*, 24 F.3d 931, 937 (7th Cir. 1994); *Kladis v. Brezek*, 823 F.2d 1014, 1019 (7th Cir. 1987), not opinions of this ilk, *see Pena v. Leombruni*, 200 F.3d 1031, 1034 (7th Cir. 1999). Mr. Logan

---

[5] The Estate also introduces Mr. Waller's opinion that the South Bend Police Department acted inconsistently with the actions and expectations of a professionally administered law enforcement agency by not addressing or documenting concerns about Sergeant O'Neill's propensity for violence [ECF 134-6 at 13]. However, this opinion isn't relevant to the excessive force claim against Sergeant O'Neill.

was unquestionably dangerous, and "the question whether the danger was sufficiently lethal and imminent to justify the use of deadly force [would be] within lay competence." *Id.*

Worse still, there is no reliable basis for saying, on this record, that Sergeant O'Neill should have shot Mr. Logan *more* times. With the knife and gunshots exchanged near simultaneously, with Mr. Logan then disarmed, and with Mr. Logan struck by one of two bullets, Sergeant O'Neill acted appropriately in immediately seeing to the suspect's medical aid rather than firing yet more shots. Mr. Waller's opinion is inherently contradictory and entirely irrelevant. His opinion that the sergeant should have fired more times doesn't fit an excessive force case at all. *See Daubert*, 509 U.S. at 591. The issue is whether Sergeant O'Neill used unconstitutionally excessive force, not whether he used insufficient force. *See Graham*, 490 U.S. at 397. His opinions prove unreliable under the law and create no triable issues for the jury.

9.      *Concluding the Excessive Force Claim.*

Upon reviewing the undisputed record and all arguments advanced by the Estate, no genuine issues of material fact remain on the excessive force claim. The Estate offers multiple, often contradictory, theories about the night's events that are untenable on the facts and the law. These theories are based on conjecture only. Instead, the record demonstrates that Sergeant O'Neill reasonably engaged Mr. Logan. Mr. Logan escalated the encounter. He raised the Gerber knife in a threatening manner. He advanced toward the officer in a confined area. He ignored commands to drop the knife. He got within seven or eight feet of the officer. He posed in that instant an imminent threat of death or serious bodily injury. Already he had ignored the officer's presence, the officer's commands, and the officer's retreating backpeddle to create distance between them—all measures in mere seconds designed to neutralize a dangerous encounter. Instead, Mr. Logan advanced and threw the knife that hit the officer as the officer shot twice. This is a tragic end to Mr. Logan's life, but the officer acted reasonably under the totality of the circumstances. No reasonable jury could say otherwise. The court grants summary judgment accordingly. *See McCoy*, 341 F.3d at 604.

B.    *The Law Requires Summary Judgment on the Equal Protection Claim.*

The Estate next alleges that Sergeant O'Neill violated Mr. Logan's equal protection rights as guaranteed by the Fourteenth Amendment. The equal protection clause mandates that people in similar situations be treated equally under the law. This clause has been the basis for numerous landmark decisions rejecting discrimination and unfair treatment of people belonging to minority groups.

To establish a violation of equal protection, the Estate must show that Mr. Logan was a member of a protected class who was similarly situated to members of another class but was treated differently because of an intentional discriminatory purpose. *See McMillian v. Svetanoff*, 878 F.2d 186, 189 (7th Cir. 1989); *Friedel v. City of Madison*, 832 F.2d 965, 971-72 (7th Cir. 1987). Without evidence showing the motive and intent to discriminate, summary judgment is appropriate. *Friedel*, 832 F.2d at 972 (citing *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir. 1985)).

The Estate offers a declaration from Lieutenant David Newton. Lieutenant Newton says another officer told him that Sergeant O'Neill "made derogatory remarks to a civilian suspect about interracial relationships, and that on other occasions he expressed his discomfort with Muslims" [ECF 134-12 ¶ 4]. Such remarks are entirely outside the bounds of common decency and the appreciation of difference, but they provide no insight into any motive or intent to discriminate against Mr. Logan on this night.

Federal rules ensure that parties present solely reliable and trustworthy evidence. The court can only consider admissible evidence in deciding a summary judgment motion. *See Gunville v. Walker*, 583 F.3d 979, 985 (inadmissible evidence will not overcome a summary judgment motion). First, Lieutenant Newton heard none of these alleged statements personally. He has no personal knowledge, and affidavits must be based on personal knowledge. *See* Fed. R. Civ. P. 56(c)(4) (affidavit opposing summary judgment must "be made on personal knowledge"); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has

20

personal knowledge of the matter."). He only shares what others told him. Second, that police department records might prove admissible, *see* Fed. R. Evid. 803(6), fails to appreciate that hearsay within hearsay often will not, *see* Fed. R. Evid. 802.[6]

In addition, even were the declaration admissible, it provides no reasonable basis for denying summary judgment. The record reveals no reason to believe that Mr. Logan was Muslim, so a singular derogatory comment about a Muslim offers no evidence to suggest Sergeant O'Neill carried a bias against African-Americans or discriminated against Mr. Logan. One statement that sexualized a Black woman, though entirely inappropriate, also offers no insight into a racial bias against Mr. Logan (a Black man). One statement made eleven years beforehand that expressed disgust at an interracial couple, though again entirely wrong and inappropriate, also offers no insight into Sergeant O'Neill's intent or motive this night, particularly when that alleged statement has not been introduced to the court by anyone who actually heard Sergeant O'Neill say it. None of these statements related to Sergeant O'Neill's interactions with citizens as part of his law enforcement duties.

The record "must be grounded in observation or other first-hand personal experience." *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). Lieutenant Newton's declaration that repeats only what he has been told but not what he has seen or heard offers nothing trustworthy or probative to consider as evidence.

The Estate has not adduced evidence on its equal protection claim—that Sergeant O'Neill treated Mr. Logan differently from others similarly situated but of a different race, that Sergeant O'Neill at any time treated African-Americans differently in the course of his law enforcement duties, or that he shot Mr. Logan motivated by a discriminatory or racial bias. Mr. Logan's daughter confirmed that, other than the color of their skin, she knew of no fact that would suggest Sergeant O'Neill discriminated against Mr. Logan [ECF 102-12 at 96].

---

[6] Nor is the declaration propensity free under Rule 404(b). *See United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014).

The law requires summary judgment on this claim accordingly. *See Pryor v. City of Clearlake,* 877 F. Supp.2d 929, 950 (N.D. Cal. 2012) (granting summary judgment without evidence of different treatment or motivations based on race); *McElroy v. City of Birmingham*, 903 F. Supp.2d 1228, 1254 (N.D. Ala. 2012) (granting summary judgment despite one incident of alleged racial profiling and seven incidents of the officer's use of force against Black males over a six-year period because there was no evidence the officer treated white males differently); *Jackson v. City of Pittsburgh*, 688 F. Supp.2d 379, 395 (W.D. Pa. 2010) ("Plaintiff has not produced any evidence creating a jury question as to the Defendant Officers' intent to deprive him of equal protection, beyond his mere allegation that Defendant Officers conspired because of racial animus."); *Loharsingh v. City & Cnty. of San Francisco*, 696 F. Supp.2d 1080, 1106 (N.D. Cal. 2010) ("evidence that the plaintiff and the defendant are of a different race or ethnicity combined with a disagreement as to the reasonableness of the defendant's conduct toward the plaintiff is alone insufficient to show a violation of the Equal Protection Clause.").

C.     *The Court Need Not Reach the Issue of Qualified Immunity.*

Because the court grants summary judgment on the excessive force and equal protection claims, the court need not reach the issue of qualified immunity because that leaves no evidence of an underlying constitutional violation. *See Los Angeles Cnty. v. Rettele*, 550 U.S. 609, 616 (2007) (once the court determines there to be no constitutional violation, "there is no necessity for further inquiries concerning qualified immunity"); *Chavez v. Martinez*, 538 U.S. 760, 766 (2003) (same).

D.     *The Court Grants Summary Judgment on the Monell Claim.*

Because the court grants summary judgment on the excessive force and equal protection claims, the court grants summary judgment on the *Monell* claim because that leaves no evidence of an underlying constitutional violation. *See Schor v. City of Chi.*, 576 F.3d 775, 779 (7th Cir. 2009) ("In order to support such a claim, however, the plaintiff must begin by showing an underlying constitutional violation, in order to move forward with her claim against the municipality.").

CONCLUSION

Construing all facts and reasonable inferences in favor of the Estate of Eric Jack Logan, the court GRANTS the defense's summary judgment motion [ECF 101], GRANTS IN PART the motion to strike as to Dave Newton's affidavit, denying the remainder as moot [ECF 142], GRANTS the motion to exclude William Harmening as a Rule 702 witness [ECF 106], GRANTS the motion to exclude Dennis Waller as a Rule 702 witness [ECF 104], GRANTS the motion to seal exhibits [ECF 135], and DENIES AS MOOT all other pending motions [ECF 109, 111, 113, and 131]. This order terminates the case, directing judgment for the defendants.

Confronted and separated by mere feet in the dead of night, Eric Jack Logan advanced toward Sergeant Ryan O'Neill with a Gerber knife raised over his head, ignoring measures designed to avert a dangerous encounter and quick commands to drop it. Mr. Logan posed in that instant an immediate threat of death or serious bodily injury. Almost one on top of the other, the knife and two bullets were exchanged. Mr. Logan was killed. Some may choose to second-guess Sergeant O'Neill's split-second decision that night, but faced with an imminent threat to his safety, he acted reasonably under the law based on all the information available to him in that moment. Today's decision might be different if the facts were different, but this record offers no proof of different facts.

SO ORDERED.

September 29, 2021                          *s/ Damon R. Leichty*
                                            Judge, United States District Court